**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 96-30116
_____


In the Matter of GIOVANNI ZEDDA AND
JANET GAUDET ZEDDA,

                              Debtors,

FERDIE JOSEPH GAUDET,

                              Appellant/Cross-Appellee,

                    versus

WILBUR J. BABIN, JR.,

                              Trustee-Appellee/Cross-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____


January 7, 1996


Before WISDOM, JONES, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

     In this bankruptcy case, Appellant/Cross-Appellee Ferdie J. Gaudet (Gaudet) appeals the judgment of the district court that affirmed the bankruptcy court's decision holding that (1) a counter letter and an act of sale and addendum by Gaudet's daughter, co-debtor Janet Gaudet Zedda (Janet), to Gaudet were fraudulent transfers, avoidable by the bankruptcy trustee Wilbur J. Babin

(Trustee) under 11 U.S.C. §548(a)(2), and (2) the fraudulently transferred property belongs to the bankrupt estate and is thus subject to administration by the Trustee. The Trustee cross-appealed from the judgment of the bankruptcy court (on remand from the district court) that $9,000 was a reasonably fair value for an undivided one-fourth naked ownership interest in the property in question and that Gaudet was entitled to reimbursement for that amount from the subject bankrupt estate. Concluding that the bankruptcy and district courts erred in excluding evidence of the true nature of the counter letter and the act of sale and thus erred in disregarding the true nature of the overall transaction, of which the excluded documents were integral parts, we reverse and hold that (1) the property in question is not included in the bankrupt estate and thus not subject to administration by the Trustee, (2) that property belongs entirely to Gaudet, and (3) Janet received a reasonably equivalent value for her undivided one-fourth naked ownership interest when she transferred it to Gaudet for $9,000, mooting the issue cross-appealed by the Trustee. In addition, we remand to the bankruptcy court so that it may dispose of any related matters in a manner not inconsistent with our holding.[1]

---

[1]We note, for example, that the Trustee has asserted a claim against Gaudet for $6,012.17, purportedly representing payments made by Janet to or for the benefit of Gaudet within one year of the filing of the petition in bankruptcy in violation of 11 U.S.C. §548.

FACTS AND PROCEEDINGS

The controversy in this case concerns the immovable property located at 238 Kenilworth Street in New Orleans, Louisiana (the Property). It had been acquired by Gaudet and his wife, Emeldia Friloux (Friloux), in October 1964 as their principal residence. Gaudet and Friloux had two children, Ferdie J. Gaudet, II (Ferdie) and Janet. Friloux died in 1980. Later that year, Janet and her husband, Giovanni Zedda, moved into the house with Gaudet and began paying the monthly expenses. By 1985, the home was in need of extensive repairs and renovation, estimated to cost almost $30,000. Gaudet and Janet discussed with Andrew J. Leaumont, then a Vice President at Security Homestead, the possibility of Gaudet's obtaining a home mortgage loan to finance the work. Leaumont advised that Gaudet probably would not qualify for a loan, as he had been retired since 1981, had only a small fixed income of $450 per month from Social Security, and had an unfavorable debt ratio. Knowing that such home mortgage loans are made only to qualified individuals who own the immovable property that will be mortgaged, Leaumont suggested that record title to the Property be placed in Janet's name so that she could obtain the loan.[2]

In August 1986, a judgment of possession was rendered in

---

[2]Leaumont indicated that the loan could not be obtained by Gaudet simply by having Janet co-sign or guarantee the loan for Gaudet, as Gaudet himself would first have to qualify for the loan, which he almost certainly would not be able to do.

Friloux's succession proceedings. It recognized that Gaudet, as the surviving spouse in community, was entitled to (1) the ownership and possession of an undivided one-half of all community property, including the Property, and (2) the Usufruct of the Surviving Spouse of the other one-half of the community property. The judgment of possession also recognized that Ferdie and Janet, as Friloux's children and sole heirs, were each entitled to the naked ownership of an undivided one-fourth of the community property, subject to Gaudet's usufruct. That same day Gaudet, Ferdie, and Janet executed and recorded in the Conveyance Records for Orleans Parish an Act of Cash Sale (1986 Deed) in which Gaudet and Ferdie transferred record title of their interests in the subject property to Janet. That Deed recited a total cash consideration of $85,028.86, but in truth Janet never actually paid anything to Gaudet or Ferdie, and Gaudet remained in possession of the property. The following February, Janet executed an Act of Real Estate Mortgage which encumbered the Property to secure a $30,000 home mortgage loan from Fidelity Homestead Association. That mortgage was recorded in the Mortgage Office for Orleans Parish on February 4, 1987.

As time passed, Ferdie became concerned about letting record title to the Property continue to stand in Janet's name, and his concerns created tension within the family. Wishing to resolve the family discord, Gaudet told Janet to do whatever was necessary to transfer record title to the Property back into his name. On June

4

6, 1990, Janet executed a counter letter (Counter Letter), which recited that (1) by virtue of the 1986 Deed she had acquired record title to the Property from Gaudet and Ferdie, (2) record title had been placed in her name for convenience only, (3) the Property actually belonged entirely to Gaudet, (4) she had paid no cash consideration for the Property, and (5) Gaudet had made all of the monthly payments on the mortgage. The Counter Letter obligated Janet, when called upon by Gaudet, to execute an act of sale conveying to Gaudet all right, title, and interest that she has or may have in and to the Property. The Counter Letter was recorded in the Conveyance Records for Orleans Parish on June 8, 1990.

On October 5, 1990, Janet and Gaudet executed an Act of Sale and Assumption (1990 Deed) in which Janet transferred record title to the Property to Gaudet. The "consideration" recited in the 1990 Deed was the payment of $54,000 in cash plus Gaudet's assumption of the $26,000 mortgage balance. That same day Janet and Gaudet executed an addendum to the 1990 Deed (Addendum) in which they recited that (1) in the 1990 Deed Janet was, in actuality, transferring to Gaudet only her inherited undivided one-fourth naked ownership, subject to Gaudet's usufruct, being the only ownership interest she had ever had in the Property, (2) record title to the other three-fourths interest had been transferred to her by Gaudet and Ferdie on August 22, 1986 [in the 1986 Deed] for convenience only and for no "consideration," all as recited in the Counter Letter, and (3) the actual consideration paid to Janet by

5

Gaudet in the 1990 transaction was $9,000, representing the estimated fair market value of the undivided one-fourth naked ownership interest in the Property which she had inherited from Friloux. The 1990 Deed was recorded in the Conveyance Records for Orleans Parish on October 9, 1990, but the Addendum was never filed for record.

On March 4, 1991, Janet and her husband (collectively, the Zeddas) filed a petition for relief under Chapter 7 of the Bankruptcy Code. Four months later, the Property was sold, by agreement of all parties, to a third party for $86,000. The net proceeds of the sale, $54,383.57, are being held in suspense by the Trustee pending the outcome of this litigation.

The Trustee filed a complaint in which he sought to avoid the transfer of the Property as <u>fraudulent</u> pursuant to 11 U.S.C. §548, or alternatively as <u>preferential</u> pursuant to 11 U.S.C. §547. This complaint also sought a declaratory judgment against Gaudet. The Trustee alleged that the transfers accomplished by execution of the Counter Letter and the 1990 Deed were fraudulent or preferential, in either alternative, subject to the Trustee's powers to set them aside and administer the Property as an asset of the bankrupt estate.

The bankruptcy court found that the transfers effected by the Counter Letter and the 1990 Sale constituted fraudulent transfers under 11 U.S.C. §548(a)(2), decreed the bankrupt estate to be the owner of the Property as of the date the Zeddas filed their

bankruptcy petition, and declared the entire net proceeds from the sale to be property of the estate and subject to the administration of the Trustee. In so doing the bankruptcy court on its own raised the specter of §544 for the first time, in an apparent effort to bolster the Trustee's powers under the third party rubric by linking that status under §544 with the power to avoid fraudulent transfers under §548.

The district court affirmed the ruling but noted that reading §544 into §548 would vitiate the powers of trustees under the latter section because debtors' transfers almost always occur before the petition is filed. That court remanded the case to the bankruptcy court, however, to determine whether Gaudet was entitled to reimbursement of the $9,000 he had paid to Janet in connection with the 1990 Deed and its unrecorded Addendum. On remand, the bankruptcy court found that Gaudet was a good faith transferee for value under 11 U.S.C. §548(c), so that he was entitled to a lien on the debtors' estate in the amount of $9,000, also finding that sum to be a fair value for the subject interest. The district court affirmed these findings of the bankruptcy court on remand, as well as that court's original rulings.

The case comes to us in the following posture: Gaudet timely appealed the portion of the district court's order affirming the bankruptcy court's decision that the Counter Letter and the 1990 Deed constituted fraudulent transfers avoidable by the Trustee under 11 U.S.C. §548(a)(2). The Trustee timely cross-appealed the

7

portion of the district court's order affirming the bankruptcy court's decision that Gaudet was a good faith transferee for value and was entitled to a lien on the bankrupt estate for reimbursement of the $9,000 that he had paid Janet.  At bottom, we must decide whether the Property properly belongs to Gaudet or to the Zeddas' bankrupt estate.

## II.

## ANALYSIS

A. STANDARD OF REVIEW

The orders of the bankruptcy court and the district court permitting the Trustee to avoid the Counter Letter and the 1990 Deed as fraudulent transfers under 11 U.S.C. §548(a)(2) and decreeing Gaudet a good faith transferee for value are conclusions of law subject to our *de novo* review.[3]  Any underlying factual determinations of the bankruptcy court are reviewed for clear error.[4]  Under this standard, we must defer to the bankruptcy court's factual findings unless, after reviewing all of the evidence, we are left with a firm and definite conviction that the bankruptcy court erred.[5]

B. APPLICABLE LAW

---

[3]See In re McDaniel, 70 F.3d 841, 843 (5th Cir. 1995); In re Young, 995 F.2d 547, 548 (5th Cir. 1993)(bankruptcy court). See also Bridges v. City of Bossier, 92 F.3d 329, 332 (5th Cir. 1996)(district court).

[4]In re McDaniel, 70 F.3d at 842-43.

[5]Id at 843.

8

1. *Bankruptcy Law*

The bankrupt estate comprises all of the debtor's legal and equitable interests in property as of the commencement of the case.[6] The Bankruptcy Code vests the trustee with the power to set aside or avoid various types of pre-petition transfers of property of the debtor so that the trustee may marshal or increase the potential assets of the bankrupt estate.[7]

In particular, Section 544, the so-called strong arm provision, vests the trustee with the rights of (1) a creditor on a simple contract with a judicial lien on the property <u>as of the commencement of the case</u>,[8] (2) a creditor with a writ of execution against the property of the debtor that is unsatisfied <u>as of the commencement of the case</u>,[9] and (3) a bona fide purchaser of the real property of the debtor <u>as of the commencement of the case</u>.[10] In essence, §544 allows the trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case. "The commencement of the case" is

---

[6]11 U.S.C. §541(a)(1) (1994).

[7]4 COLLIER ON BANKRUPTCY ¶544.01 (15th ed. 1996).

[8]11 U.S.C. §544(a)(1) (1994)(emphasis added).

[9]11 U.S.C. §544(a)(2) (1994)(emphasis added).

[10]11 U.S.C. §544(a)(3) (1994)(emphasis added).

synonymous with the filing of the bankruptcy petition.[11]

In addition to the strong arm provision of § 544, the Trustee possesses a number of other specific avoidance powers,[12] one of which is the power to avoid transfers that are made by the debtor in fraud of his creditors.[13]  Under §548, a transfer is fraudulent if it (1) transfers an "interest of the debtor in property" and (2) is made either (a) with an intent to hinder, delay, or defraud creditors[14] or (b) for less than a reasonably equivalent value and causes or increases the debtor's insolvency.[15]  Although both §544 and §548 empower the trustee to increase the assets of the bankrupt estate by avoidance of transfers, these powers are wholly separate

---

[11]11 U.S.C. §301 (1994).

[12]The trustee's specific avoidance powers include the avoidance of statutory liens (11 U.S.C. §545), the avoidance of preferential transfers of the debtor's property to third persons (11 U.S.C. §547), the avoidance of fraudulent conveyances (11 U.S.C. §548), and the avoidance of certain transactions after bankruptcy (11 U.S.C. §549).

[13]11 U.S.C. §548 (1994).

[14]11 U.S.C. §548(a)(1) (1994).

[15]11 U.S.C. §548(a)(2)(A) and (B)(i)(1994).  A transfer for less than reasonably equivalent value may also be fraudulent under §548(a)(2) if, instead of the transfer causing or increasing the debtor's insolvency, the debtor (1) was engaged in or was about to engage in business or a transaction for which any property remaining with the debtor was an unreasonably small capital or (2) intended to incur, or believed that he would incur, debts that would be beyond his ability to pay as such debts matured.  11 U.S.C. §548(a)(2)(B)(ii) and (iii)(1994).

from and independent of one another.[16]

2. *Louisiana Law - The Public Records Doctrine and its intersection with §544*

Louisiana law requires that specified types of instruments be filed in the public records if they are to affect the rights of third persons.    This concept is known as the Public Records Doctrine and is stated in the Civil Code Ancillaries as follows:

> No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease, or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated.  Neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.[17]

A third person is defined to include the following:

> [A]ny third person or third party dealing with any such immovable or immovable property or acquiring a real or personal right therein as purchaser, mortgagee, grantee or vendee of servitude or royalty rights, or as lessee in any surface lease or leases or as lessee in any oil, gas or mineral lease and all other third persons or third parties acquiring any real or personal right, privilege or permit relating to or affecting immovable property.[18]

For purposes of §544 of the Bankruptcy Code, the Trustee stands in the shoes of a hypothetical creditor or bona fide

---

[16]In re Mortgageamerica Corp., 714 F.2d 1266, 1275 (5th Cir. 1983)(distinguishing §544's incorporation of state fraudulent conveyance law from §548, a federal fraudulent conveyance provision).

[17]La. R.S. 9:2721 (Supp. 1996)(emphasis added).

[18]La. R.S. 9:2722 (1991).

11

purchaser <u>as of the commencement of the case</u>. For purposes of Louisiana's Public Records Doctrine, a creditor or a purchaser is a third person. Applying that doctrine to § 544, it is clear that the Trustee is a third person for purposes of the public records when he assumes the status of a hypothetical creditor or a bona fide purchaser as of the commencement of the case. This conclusion is supported by the Trustee's correct assertion that he occupies the position of a third party who is entitled to rely on the public records.

The Trustee is wrong as a matter of law, however, when he assumes that his third party status under §544 entitles him to rely on the public records for purposes of §548. For §544 makes the Trustee a third party only for purposes of exercising the specific powers granted to him under that one section, not all powers granted to trustees elsewhere in the Bankruptcy Code. There is absolutely nothing in §548 that makes the Trustee a third party for purposes of that section; neither is there anything, there or elsewhere, that provides the linkage between §544 and §548 needed to justify the Trustee's assertion that his status as a third party under §544 can be read to apply in conjunction with §548. Any effort to make that leap of linkage is a classic "step" transaction, an unwarranted attempt to bootstrap a nexus where none exists. On this point we are in apparent agreement with the district court.

Nevertheless, the Trustee as a third person is entitled to the

12

protection of the public records for purposes of marshaling assets under §544. Consequently, the Trustee may include in the bankrupt estate any property the record title to which stands in the debtor's name as of the commencement of the case, irrespective of whether the debtor is entitled to <u>ownership</u> of the property, i.e., legal or equitable title, as distinct from record title. Section 544 may be read as relying on the principle of ostensible ownership, which stands for the proposition that, other things being equal, what the creditor sees ought to be what the creditor gets.[19]

C. NO RECORD OWNERSHIP AS OF THE COMMENCEMENT OF THE CASE — §544

A "snapshot" of the public records on the day that the Zeddas filed their petition reflects a familiar Louisiana chain of title, with record title to the Property standing in the name of Gaudet, <u>not</u> Janet. As such, no third party could have taken a deed from Janet and obtained record title, or filed a judgment against Janet and obtained a judicial or legal mortgage, so neither could the Trustee "take" the Property from Janet and include it in the bankrupt estate in reliance on §544. She had no record title to the Property on that day, nor had she for the previous five or six months.

Perhaps the obverse fact situation best proves this point. If

---

[19]<u>In re Granada, Inc.</u>, 92 B.R. 501, 509 (Bankr. D. Utah 1988)(quoting <u>In re Great Plains Western Ranch Co., Inc.</u>, 38 B.R. 899 (Bankr. C.D. Cal. 1984)).

this case had been one in which record title to the Property stood in Janet's name under a simulated cash sale deed on the day the bankruptcy petition was filed, there is no question that the Trustee would have claimed it as property of the estate under authority of §544; neither is there any question but that the bankruptcy court would have ordered the Property included in the bankrupt estate under authority of §544. The Public Records Doctrine would have protected a third party purchaser or judgment creditor on that date, so under §544 it would have protected the Trustee as well. But that is not the instant case: When, as here, the debtor is not the holder of record title to the property at the commencement of the case, the Public Records Doctrine, which would not protect a third party who took a deed or a mortgage from the debtor on that date, cannot and does not protect the Trustee, whose rights under §544 can be no greater than those of a hypothetical creditor or purchaser.

Clearly, then, unless we were to create a fiction that would permit the Trustee to rely retroactively on the public records, this case as decided by the bankruptcy court cannot stand, at least not on authority of §544. When the Trustee is in the shoes of a third party creditor subject to the public records by virtue of §544, the situation can only be measured on the basis of a snapshot of those records taken on the day of the filing of the petition.[20]

---

[20]11 U.S.C. §544 (1994)(taking a snapshot of the public records as of the commencement of the case).

14

Thus only by fictionally moving the transaction date back in time to the day before the recordation of the Counter Letter (and thus before the recordation of the 1990 Deed) and treating the Trustee's §544 right to avoid the transfer as though it had occurred on that date, can the Trustee's position, as approbated by the bankruptcy court, be sustained.

We discern no authority whatsoever in §544, or elsewhere for that matter, for making such a stretch; certainly none can be gleaned from §548. Frankly, we are unwilling to engage in the kind of judicial legislation that would be necessary to give the Trustee this fictional and unauthorized power to link §§544 and 548. In short, the Trustee is not allowed to reach back to some arbitrary, anterior time and invoke the public records rights of a creditor or purchaser as of that date, particularly when it is recognized that no actual creditor or purchaser could do so. Section 544 does nothing more than put the Trustee in the exact same shoes as those of such a third party; it does not give the Trustee either stilts or Seven League boots to augment the ordinary footwear of the hypothetical creditor or purchaser.[21]

---

[21]In re Wilson, 4 B.R. 605, 607 (Bankr. E.D. Wash. 1980)(citing H.W. Glessner v. Massey-Ferguson, Inc., 353 F.2d 986 (9th Cir. 1965), cert. denied, 384 U.S. 970, 86 S. Ct. 1859 (1966)).

D. FRAUDULENT TRANSFER — §548

 1. *Actual Fraud — §548(a)(1)*

As §544 is not here available to the Trustee, he must rely on some other avoidance authority if he is to include the Property in the Zeddas' bankrupt estate. In this instance, he must prove that Janet made a transfer either in actual fraud of creditors under the intendment of §548(a)(1), or for less than a reasonably equivalent value within the intendment of §548(a)(2). It is significant that there was no allegation by the Trustee and no finding by either the bankruptcy or district court that the Property was transferred in bad faith or with actual fraudulent intent as is required if §548(a)(<u>1</u>) is to appertain; that leaves only §548(a)(<u>2</u>).

 2. *Less than a Reasonably Equivalent Value — §548(a)(2)*

The paramount purpose of the Bankruptcy Act is to provide equality of distribution among creditors.[22] A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the creditors.[23] We noted earlier that a transfer may be avoidable under §548(a)(2) if it was a transfer (1) of "an interest of the debtor in property,"[24] (2) made on or within one year before the date of the filing of the petition, (3)

---

[22]<u>In re Great Plains Western Ranch Co. Inc.</u>, 38 B.R. at 903 (quoting 4B COLLIER ON BANKRUPTCY ¶70.45 (14th ed. 1978)).

[23]<u>In re Wilson</u>, 4 B.R. at 607.

[24]11 U.S.C. §548(a) (1994).

16

for less than a reasonably equivalent value, (4) which caused or increased the debtor's insolvency.[25]  To achieve the equitable purpose of bankruptcy law, particularly the purpose of §548(a)(2), a trustee must look at the realities of the situation and examine the true nature of all transactions made on or within one year of the filing of the petition.  Substance trumps form.  As such, record title, albeit crucial to the trustee's powers under §544, is wholly irrelevant to his powers under §548.[26]

*3. Did Janet have an interest in the Property under state law?*

To satisfy the first element of §548(a)(2), the debtor must transfer "an interest of the debtor in the property."[27]  The bankruptcy court and the district court assumed that Janet had a 100% interest in the Property by virtue of the 1986 Deed in which Gaudet and Ferdie transferred their interests in the Property to Janet.  That assumption is the Achilles' heel of the holdings of those courts, however, for whether the debtor has an interest in the property is always a question of state law.[28]

Under Louisiana law, an instrument is a simulation when, by

---

[25]11 U.S.C. §548(a) (1994).

[26]See In re Mortgageamerica Corp., 714 F.2d 1266, 1275 (5th Cir. 1983)(noting that §544 and §548 are distinct powers that come from separate sources).

[27]11 U.S.C. §548(a) (1994).

[28]In re Oxford Management, 4 F.3d 1329, 1334 (5th Cir. 1993); In re Haber Oil Co., Inc., 12 F.3d 426, 435 (5th Cir. 1994); In re Maple Mortgage, Inc., 81 F.3d 592, 596 (5th Cir. 1996).

17

mutual agreement, it does not express the true intent of the parties.[29]  Regardless of possible effects it might have on third parties, a simulation is absolute when the parties to it intend for the contract to produce no effects between them.[30]  A simulated sale does not actually transfer ownership of the property: A sale is a simulation when the parties have no good faith intent to transfer ownership, i.e., when it is nothing more than a sham.[31]

Even though by definition a simulated sale does not effect a transfer of ownership between the parties, it is nonetheless an "acte juridique" or juridical act and must be supported by the Civil Law notion of "cause" or "causa."[32]  Cause, as distinguished from the common law concept of consideration, i.e., an exchange of equivalent values, is akin to motive, or the reason why a party obligates himself.[33]  Even if there is not "something of value" akin to common law consideration or a quid pro quo given in exchange for the execution of the simulation, the transaction may still be valid under Louisiana law if there is cause for its execution.[34]  As a

---

[29]La. Civ. Code art. 2025.

[30]La. Civ. Code art. 2026.

[31]Crawford v. Fitzgerald, 532 So.2d 382, 384 (La. App. 3d Cir. 1988).

[32]An obligation cannot exist without a lawful cause.  La. Civ. Code art. 1966.

[33]La. Civ. Code art. 1967.

[34]Simulations are not uncommon in Louisiana; neither does their use imply anything negative or untoward.  It is a typical practice

18

general proposition, the binding reconveyance obligation of the party who receives record title to property in a simulated sale is sufficient cause to support such a transaction.

Under Louisiana law, the transaction memorialized in the 1986 Deed was obviously an absolute simulated sale. The parties had no good faith intent for legal or equitable ownership to pass to Janet when they used the 1986 Deed to place record title of their interests in Janet's name. The true purpose — indeed, the sole purpose — of the 1986 Deed was to enable Janet, as Gaudet's undisclosed agent, to qualify for and obtain a loan that in truth would benefit Gaudet and the Property; and the cause for the record title transferring transaction was supplied not only by Janet's agreement to take out the loan in her name for the benefit that Gaudet would realize but also by Janet's obligation to reconvey the Property to Gaudet. When the Counter Letter, the 1990 Sale, and the Addendum are viewed in pari materiae, they reveal the true nature of the transaction: The Property had been transferred for

---

in Louisiana, for example, for children who have inherited the naked ownership of a deceased parent's share of the former community property, subject to a usufruct in favor of the surviving parent, to reconvey their naked ownership interests — especially in the case of the parents' home — to the surviving parent so that he or she may enjoy full ownership of the property for the remainder of his life, in anticipation that such property ultimately devolves upon the children at the surviving parent's death. Such a transfer may be accomplished by a simulated sale in which the children convey their interests to the surviving parent for a recited cash consideration that in fact is never paid. In addition, historically, because the recordation of a donation created a cloud on the record title, a party who made a donation often executed and recorded a simulated sale.

19

convenience only, and no cash or other assets of value were paid or given for the transfer.

Indeed, the truth of the recitation of facts in the Addendum was accepted by the bankruptcy court and went uncontradicted by the evidence. Even though counter letters are customarily executed contemporaneously with the initial transfer, the instant Counter Letter served the same purpose by stating the realities of the situation even at its delayed date of execution. Again, neither the evidence nor the determinations of the bankruptcy court so much as hint at anything collusive or post hoc about the subsequent execution and recordation of the Counter Letter.

Notably, the lower courts did not find that the 1986 Deed is not a simulation. But neither could they have found that the instrument is a simulation given their refusal to consider the Counter Letter, the 1990 Deed, and the Addendum.

Whether the 1986 Deed is a simulation is a question of contract interpretation. By definition, the issue of simulation involves a determination of whether the instrument under scrutiny is something other than what meets the eye. It follows necessarily that a proper and complete analysis of whether the 1986 Deed is a simulation turns of necessity on consideration of extrinsic evidence — specifically the Counter Letter, the 1990 Deed, and the Addendum, as well as testimony credited by the court.

The lower courts' refusal to consider these documents was erroneous. When we consider the excluded documents and the

20

supporting testimony that is in the record, we find that the transaction, which was cast as a sale in the 1986 Deed, is not a sale at all, and thus is a simulation in fact and in law. Once the Counter Letter, the 1990 Deed, and the Addendum are considered, as they should have been, the evidence offered by the Trustee to disprove a simulation (i.e., that Janet lived in the house, made mortgage payments, and directed what improvements would be made) is seen to be immaterial. This conclusion follows as a matter of law from the undisputed documents and testimony, rendering remand for further finding unnecessary.

As the 1986 Deed is a simulation and thus vested no true ownership in Janet, she had no "interest in the property" (beyond her undivided one-fourth naked ownership interest which she had inherited from her mother[35]) in 1990 that she could have transferred to Gaudet. Under §548(a)(2), that is the end of the inquiry.

*4. The effect of the simulation on the Trustee*

The bankruptcy and district courts ruled that evidence and testimony about the Counter Letter and 1990 Deed would be parol evidence and therefore inadmissible against the Trustee as a third person entitled to the protection of the Public Records Doctrine. But the bankruptcy and district courts erred, even to the point of abuse of discretion, in treating the inquiry under §548(a)(2) ——

[35]Janet's transfer of her undivided one-fourth naked ownership interest is discussed in part 5 *infra*.

21

the classic search for truth and the realities of transactions —— as an evidentiary question and in disallowing evidence of the Counter Letter and the 1990 Sale. This evidence clearly cannot be ignored under §548(a)(2), even though it might have been properly excluded had a §544 public records avoidance been available to the Trustee.

The district court stated that Louisiana's recordation law compelled the harsh result of divesting Gaudet of property which he never really conveyed to his daughter and for which she had never paid anything. Implicit in this statement is the district court's recognition that the transaction was in actuality, as contended by Gaudet, a simulated sale which transferred no ownership between the parties. The district court, however, erroneously treated the issue as an evidentiary one, thereby following the Trustee's red herring by employing the Public Records Doctrine and the parol evidence rule to exclude evidence that proves the truth and reality that is the simulation. When the Trustee successfully sold that bill of goods to the bankruptcy court and district court, he carried the day that never should have been carried.

Although record title and the Public Records Doctrine protect the Trustee as a third party under §544, they are wholly irrelevant and immaterial to a fraudulent transfer inquiry under §548. The focus of §548(a)(2) is on actual ownership — not mere record title. Neither the Public Records Doctrine nor the parol evidence rule can function as a false prophet to preclude consideration of evidence

22

of the true nature of the transaction in question. After all, the very essence of a §548(a)(2) inquiry is that self-same true nature. When the transfer has already taken place, regardless of the totally irrelevant fact that it occurred during the twelve months prior to the date of the petition, the court must examine the realities of the transaction; and the realities of this situation reveal beyond peradventure that the 1986 transaction was a simulated sale which had no effect on either legal or equitable ownership.

Janet's only actual interest in the property at any time before the 1990 Deed was her inherited undivided one-fourth naked ownership interest. Ironically, that was the only asset that was not affected by the simulated 1986 Deed, and that is the only interest that for the first and only time she actually conveyed to Gaudet in the 1990 Deed. As that conveyance was a transfer of an interest of the debtor in property within one year of the filing of the petition in bankruptcy, the only remaining question is whether Janet's transfer <u>of that fractional naked ownership</u> was made for less than a reasonably equivalent value under §548(a)(2).

*5. Did Janet Transfer Her Interest for Less Than Reasonably Equivalent Value?*

Whether a transfer is made for a reasonably equivalent value is, in every case, largely a question of fact. As such, considerable latitude must be allowed to the trier of facts,[36] for

---

[36]4 COLLIER ON BANKRUPTCY ¶548.09 (15th ed. 1996).

23

in each case that determination depends entirely on the peculiar facts and circumstances.[37]  In evaluating the 1990 Deed, the only aspect of the transaction that the bankruptcy and district courts examined was the common law cash consideration of $9,000 received by Janet from Gaudet in payment for her undivided one-fourth naked ownership.  Yet both courts excluded evidence regarding the true nature of the transaction.  By way of a proffer, however, that evidence is nonetheless in the record for all to see.  On the basis of the proffered evidence, we affirm the bankruptcy court's determination on remand that $9,000 is a reasonably equivalent value given in exchange for an undivided one-fourth naked ownership interest in this Property.  On this point, both the bankruptcy and district courts appear to be in agreement.[38]

III.

CONCLUSION

Janet did not hold record title to the Property on the date the petition was filed, so the Trustee cannot include the Property in the bankrupt estate in reliance on §544.  As observed by the district court, it is only when the debtor holds record title to the property as of the commencement of the case that the Trustee is entitled to invoke §544's protection of the public records in

---

[37]In re Smith, 24 B.R. 19, 23 (Bankr. W.D. N.C. 1982).

[38]See discussion regarding the district court's remand and the bankruptcy court's findings on remand, near the end of section I, Facts and Proceedings.

24

asserting his rights.

Consequently, when, as here, the debtor does not have record title as of the commencement of the case, the Trustee must turn to, inter alia, §548 to assert his power to avoid fraudulent transfers previously consummated. Still, there is nothing in §548 that puts the Trustee in a §544 third party position, so the Trustee may not invoke the Public Records Doctrine or the parol evidence rule to preclude a determination of the true nature of the transaction under state law. When we examine the realities here at play, we are left with no doubt whatsoever but that (1) the transaction evidenced in the 1986 Deed was a simulated sale, and (2) the true nature of the transaction is revealed in the Counter Letter, the 1990 Deed, and the Addendum.

To the extent that they were inextricably intertwined with a simulation that did nothing but transfer mere record title as a matter of convenience in obtaining a legitimate home improvement loan, the Counter Letter and the 1990 Deed could not possibly have produced transfers of an "interest of the debtor in property." And as whatever was transferred was surely not such an interest, then by definition there were no fraudulent transfers within the contemplation of §548(a)(2). Therefore, the entire proceeds from the agreed sale of the Property belong to Gaudet and are neither includible in the Zeddas' bankrupt estate nor subject to administration by the Trustee. The transfer of Janet's undivided one-fourth naked ownership interest to her father for $9,000 was

25

not a transfer for less than a reasonably equivalent value, but inasmuch as Gaudet actually paid Janet the $9,000 in closing the reconveyance by the 1990 Deed, no further liens, reimbursements, or other adjustments are required between Gaudet and the Trustee in that regard.

In light of the foregoing, we reverse the holdings of the bankruptcy court as affirmed by the district court and render judgment in favor of Gaudet, ordering the Trustee to deliver to Gaudet the entire proceeds of the sale of the Property, together with all accrued interest. In addition, we remand to the bankruptcy court to dispose of any pending related matters in a manner not inconsistent with our holding today.

REVERSED, RENDERED in part, and REMANDED in part.